# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Richardson Miles Hanckel, III,<br><br><div align="right">Debtor.</div> | Case No. 12-04936-dd<br><br>Adv. Pro. No. 14-80116-dd<br><br>Chapter 7 |
| Richardson Miles Hanckel, Jr.,<br><br><div align="center">Plaintiff,</div><br>v.<br><br>Kevin Campbell, Trustee,<br><br><div align="right">Defendant.</div> | **ORDER** |
| Kevin Campbell, Trustee,<br><br><div align="center">Plaintiff,</div><br>v.<br><br>Richardson Miles Hanckel, Jr.,<br><br>and<br><br>Hanckel Properties, LLC and Pam Hanckel,<br><br><div align="center">Third Party Defendants.</div> | |

This adversary proceeding is before the Court on the amended complaint filed by Richardson Miles Hanckel, Jr. ("Plaintiff" or "Miles") against Kevin Campbell, chapter 7 trustee ("trustee"); the counterclaims asserted by the trustee; and the third party complaint filed by the trustee against Pam Hanckel ("Pam") and Hanckel Properties, LLC ("Hanckel Properties") (collectively, "Third Party Defendants"). The Court granted partial summary judgment on July 7, 2015, and held a trial on the remaining issues on October 20 and 21, 2015. Jurisdiction for this

1

proceeding is premised upon 28 U.S.C. §§ 1334 and 157(a). Venue is proper under 28 U.S.C. §

1409. This adversary proceeding is a core proceeding. 28 U.S.C. § 157(b)(2)(O). After careful

consideration of the applicable law, arguments of the parties, and evidence submitted, the Court

issues the following findings of fact and conclusions of law under Fed. R. Civ. P. 52(a), made

applicable by Fed. R. Bankr. P. 7052.[1]

## I.    Findings of Fact[2]

1.    Hanckel Marine, LLC ("Hanckel Marine") is a boat sales and repair business

formed in 2000 by Miles and his son Richardson Miles Hanckel, III ("Debtor" or "Milo").

2.    Miles and Milo formed Hanckel Marine and signed an operating agreement.[3] Each

owned 50% of Hanckel Marine.

3.    Relevant to this proceeding are the following provisions of the operating

agreement:

**3.3 Restrictions on the disposition of a membership.**

**A. Membership and transferability of Memberships in the Company are
substantially restricted.** Neither record title nor beneficial ownership of a
Membership may be transferred or encumbered without the consent of all Members
at the time of transfer.
…

A Disposition of a Membership in the Company may not be effected
without the consent of all Members at the time of Disposition and the consent of a
Majority in Interest of the non-Disposing Members to continue the business. Any
attempted Disposition by a Person of an interest or right in or in respect of the
Company other than in accordance with this section shall be, and is hereby declared,
null and void ab initio.

---

[1] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

[2] Many of the background facts were established by the Court's order in *Campbell v. Hanckel, et al. (In re Hanckel)*, 512 B.R. 539 (Bankr. D.S.C. 2014) *aff'd Hanckel v. Campbell (In re Hanckel)*, 2015 WL 7251714, Case No. 2:14-cv-2898 (D.S.C. March 10, 2015) (Gergel, J.) (slip op.).

[3] Ex. 1.

**C.** The Company may not recognize for any purpose any purported Disposition of a Membership unless and until the other applicable provisions of this section have been satisfied …

### 3.4 Additional Members

Additional Persons may be admitted to the Company as Members and Memberships may be created and issued to those Persons and to existing Members at the direction of a Required Interest[4] of Members, on such terms and conditions as the Required Interest may determine at the time of admission … Notwithstanding the foregoing, the Members of the Company shall have a preemptive right to acquire additional, newly created Memberships of the Company, or securities of the Company convertible into or carrying a right to subscribe to or acquire Memberships, except to the extent limited or denied by this Operating Agreement or the Articles.

### 3.5 Interests in a member

A Member that is not a natural person … [upon] breach of the provisions [in the operating agreement] … the Company [Hanckel Marine] shall have the option to buy, and on exercise of that option the breaching Member shall sell, the breaching Member's Membership…

### 3.24 Buyout of a disassociated member

If, following the withdrawal, death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event which terminates the continued Membership of a Member in the Company, [and] a Majority in Interest of the remaining Members vote to continue the Company, the disassociating Member shall be entitled to receive any distribution which the disassociating Member was entitled to receive prior to the withdrawal, death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event which terminates the continued Membership of a Membership in the Company. The Member shall additionally receive the fair market value of the Member's Membership in the Company as of the date of the withdrawal, death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event which terminates the continued Membership of a Member in the Company determined as provided in Section 33-44-701 of the Act. The date of payment shall be made pursuant to the provisions of Section 33-44-701(b) of the Act.

4.      Pam, Milo's mother and Miles' wife, was not and is not an owner of Hanckel

Marine. She does, however, participate significantly in the business as the bookkeeper.

---

[4] "Required Interest" is defined in Article I of the operating agreement as 100% of the LLC members.

5.      Pam and Miles own Hanckel Properties. Hanckel Properties owns the land and buildings that Hanckel Marine uses for its business.

6.      In 2009, the general economic decline caused an impact on the recreational industry, and caused Milo business debt problems with other investments while Hanckel Marine also struggled.

7.      In October of 2010, Milo, Miles, Pam, and their advisors decided it would be best to "take Milo out of Hanckel Marine by a transfer of his interest to Miles and Pam."[5]

8.      They spent the next six months or so settling some of their debts and working to disentangle Milo from Hanckel Marine.

9.      On June 18, 2011, Miles and Milo signed a Dissociation Agreement.[6] The agreement provided that upon the Milo's transfer of his interest, Miles would be the sole member of Hanckel Marine.

10.      Shortly thereafter, Milo settled a lawsuit against a former business partner, Steven Potts ("Potts"), through a consent judgment totaling $1,953,927.71.

11.      On August 9, 2012, Milo filed for protection under chapter 7 of the bankruptcy code.[7] Kevin Campbell was appointed trustee.

12.      Milo listed the transfer of his interest in Hanckel Marine in his statement of financial affairs, valuing that interest at $0.[8]

---

[5] Ex. L.

[6] Ex. 2. "Dissociated" and "disassociated" are used interchangeably in the relevant documents and in this order.

[7] Case No. 12-04936-dd.

[8] *Id.*, Dkt. 1.

13.     On November 13, 2012, Potts initiated an adversary proceeding against Milo alleging causes of action for constructive fraud and fraudulent transfer with regards to Milo's transfer of his interest in Hanckel Marine.[9]

14.     On April 17, 2013, the Court entered an order authorizing the employment of Potts' lawyer as special counsel to the trustee.[10] The trustee was substituted as plaintiff in the adversary proceeding in August of 2013.[11]

15.     On May 28, 2014, the Court entered an order granting summary judgment in favor of the trustee. The Court held that Milo's conveyance of his interest was a fraudulent transfer, and that "[g]iven … the difficulty in valuing his [Debtor's] interest, and the lack of evidence of any depreciation in the interest's value since the transfer," the appropriate remedy pursuant to 11 U.S.C. § 550[12] was recovery of the interest by the estate.

16.     The Court's order further noted that "[t]he issue of whether the operating agreement limits what Plaintiff [trustee] can do with Milo's management rights, including whether Plaintiff [trustee] can convey those rights to someone else, is not before the Court."

17.     That order was appealed and subsequently affirmed.[13]

18.     This adversary proceeding was filed on October 14, 2014, while the appeal of the Court's earlier order was pending.

19.     Plaintiff's original complaint[14] is summarized as follows:

---

[9] Adv. Pro. No. 12-80247-dd.

[10] Case No. 12-04936-dd; Dkt. 28.

[11] Adv. Pro. No. 12-80247-dd; Dkt. 23.

[12] Further references to 11 U.S.C. § 101 *et seq.* will be by section number only.

[13] *Supra* note 2.

[14] Dkt. 1

a.  The operating agreement governing Hanckel Marine was drafted and executed with the intention of governing a family business, therefore it contains a variety of provisions that make the operation of Hanckel Marine impracticable with a non-family member.

b.  The operating agreement also contains a variety of restrictions on the transfer of a Hanckel Marine membership that make the transfer of anything more than a member's distributional interest impossible.

c.  Plaintiff and his wife have made significant loans to the business, and these loans, along with the floor plan financing loans and other UCC liens, result in Hanckel Marine having no money available for distributions to members.

d.  The interest recovered by the estate should be recognized as either a dissociating or dissolving event, thus the interest held by the estate is a dissociated interest or whatever a member would be entitled to upon dissolution of Hanckel Marine.

e.  The complaint ends by asking that Hanckel Marine be judicially dissolved; wound up; its assets distributed; and the fair market value of the Debtor's membership interest valued at zero.

20.   Trustee answered the complaint on November 21, 2014.[15] The trustee's answer generally denied the allegations in the complaint and admitted he was seeking buyers of the interest.

21.   Additionally, the trustee asserted various counterclaims and a third party complaint:

---

[15] Dkt. 5. The answer due date in the summons was November 14, 2014. SCLBR 7001-1(b) permits parties to extend deadlines one time for a time period not to exceed fourteen (14) days upon filing an extension with the court. No extension was filed in this case, however, no party objected to the late answer.

a. First, that dissolution of Hanckel Marine would "contravene 11 U.S.C. §§ 541(c)(1) and 363."

b. Second, that § 363(h)[16] permits the trustee to sell both the estate's and Plaintiff's interests in Hanckel Marine.

c. Third, as a counterclaim against Miles and a third party complaint against Pam, that their loans to Hanckel Marine either be equitably subordinated or characterized as capital infusions.

d. Fourth, that the Court estop Hanckel Properties from terminating its lease, which Hanckel Properties had threatened to do should the interest in Hanckel Marine be sold.

22.     On January 5, 2015, Pam filed an answer to the third party complaint denying the allegations.[17]

23.     Also on January 5, 2015, Hanckel Properties filed a motion to dismiss the claim against it, arguing that the complaint did not properly allege the existence of a lease.[18]

24.     Plaintiff also filed a motion to dismiss the § 363(h) counterclaim, arguing that Milo's LLC interest did not fall within the categories of interests that could be sold pursuant to § 363(h).[19]

---

[16] Section 363(h) provides, in relevant part, that "the trustee may sell both the estate's interest … and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety …" under certain circumstances.

[17] Dkt. 10.

[18] Dkt. 12.

[19] Dkt. 11.

25.     The trustee responded to the motions to dismiss, and filed a motion to dismiss or stay of his own:[20]

    a.  Trustee responded that Pam had admitted, under oath, that a lease existed between Hanckel Marine and Hanckel Properties.

    b.  Trustee reasserted his argument that he could sell the property pursuant to § 363(h).

    c.  Trustee asked that the case be stayed or dismissed without prejudice until the appeal of the Court's order on the fraudulent transfer and recovery adversary proceeding was final, arguing that if the Court's earlier order was reversed it would moot the current litigation.

26.     Plaintiff and Third Party Defendants (collectively, "the Hanckels") responded to the trustee's request to stay or dismiss, disputing that the appeal mooted this case.[21]

27.     The Court held a hearing on the motions on February 24, 2015, then denied the trustee's motion to stay or dismiss. The Court questioned its authority to enjoin Hanckel Properties from terminating the lease, but permitted that cause of action to survive dismissal. The Court granted the motion to dismiss as to the § 363(h) issue.

28.     Also at the hearing, counsel for the Plaintiff made clear that the purpose of this adversary proceeding was to either continue or wind up the business, and regardless pay the trustee whatever value to which the estate was entitled.

29.     The Court's order avoiding the transfer of LLC interest and ordering its recovery was affirmed on March 10, 2015.[22]

---

[20] Dkts. 14, 15 and 16.

[21] Dkt. 18.

[22] *Supra* note 2.

30.     Plaintiff filed an amended complaint on March 19, 2015.[23] The amended complaint pled, as an alternative form of relief to dissolution, that the Court find the interest held by the bankruptcy estate to be a distributional interest as of the filing of the petition, and that the value of that interest is $0.

31.     On March 23, 2015, Plaintiff filed a motion for summary judgment asking the Court to find that the estate held a dissociated interest, or that the estate's interest was otherwise limited to a distributional interest.[24]

32.     Also on March 23, Hanckel Properties filed an answer to the complaint against it, generally denying the allegations.[25]

33.     Trustee answered the amended complaint on April 7, 2015, again generally denying all allegations and reasserting his remaining counterclaims and third party complaints.[26]

34.     On April 27, 2015, the trustee amended his counterclaim and third party complaint to clarify his cause of action to subordinate or re-categorize the loans Miles and Pam made to Hanckel Marine.[27]

35.     That same day, Hanckel Properties and Pam filed amended answers.[28]

36.     On May 11, the trustee responded to Plaintiff's motion for summary judgment, arguing that the interest was not dissociated or otherwise limited.[29]

---

[23] Dkt. 25. At Dkt 29, Plaintiff asked the Court to accept the Hanckel Properties answer out of time. The trustee consented to the filing out of time at a subsequent hearing, as well as the amended complaint.

[24] Dkt. 27.

[25] Dkt. 28. Dkt 29 is the motion to file out of time, which the Court granted with the trustee's consent at Dkt. 31.

[26] Dkt. 32.

[27] Dkt. 45-1. The Court permitted the amendment over the Plaintiff and Third Party Defendants objections. Dkt. 50, 52.

[28] Dkt. 46, 47.

[29] Dkt. 51.

37.     Third Party Defendants filed a reply to the trustee's response on June 10, 2015, asking the Court to rule on the value of the interest held by the estate.[30]

38.     After hearing the arguments of the parties, the Court granted partial summary judgment as to the nature of the interest held by the estate.[31] The order concluded:

> The estate holds the dissociated interest of Milo. There is a material dispute of the fact as to the value of that interest as of the date of the transfer from Milo to Miles and at other, perhaps relevant, times. Those issues, whether there is some distributional interest that Milo should have received absent the transfer and assuming the on-going, proper, and fair-handed operation of Hanckel Marine, LLC, and the election of dissolution or a judgment for the value, if any, of the membership interest, remains.

39.     At the hearing on the motion for summary judgment, the trustee noted that the issue of value was an issue for trial, and that the parties were conducting discovery on that issue.

40.     The trustee also noted, and the Court agreed, that the issue of what the trustee could do with the interest with respect to selling or otherwise transferring it was not properly before the Court.

41.     In accordance with the terms of the Court's order on partial summary judgment, the parties both filed proposed pre-trial orders.[32] In his proposed order, for the first time, the trustee raised the argument that the Court lacked authority to value the interest held by the estate.

42.     Trial occurred on October 20 and 21, 2015.[33]

---

[30] Dkt. 58.

[31] Dkt. 63. The reasoning for this ruling is further expanded upon *infra*.

[32] Dkts. 71, 72.

[33] Trial was originally scheduled for September 30, 2015, but was continued at the request of the Defendant. The parties also submitted a pretrial outline of their arguments, and post-trial proposed orders, in lieu of opening statements and closing arguments.

43.     Miles was the first witness to testify at trial. Miles testified that he was born and raised in the boating business. His formal education ended after high school. He is the president of Hanckel Marine and his job duties are varied, including sales and servicing the boats.

44.     Miles testified that Pam handled all of the office manager duties and bookkeeping for Hanckel Marine, and that he had very little understanding of the financial aspects of the business. He said that he, along with Pam and the Hanckel Marine advisors, decided Milo needed to be out of the business so it could survive. He testified that all of the family's assets are tied up in the business.

45.     Miles also testified that he currently receives a salary of about $1,300 per month from Hanckel Marine, and that this amount was far below market value for his services.

46.     He testified that he did not know the difference between capital contributions and loans, and that Hanckel Marine was kept afloat by Pam lending it money.

47.     Finally, he testified that he believed Milo's interest at the time of the transfer and thereafter was worthless.

48.     Milo testified. Milo stated that he, along with his parents, relied heavily on the advice of their accountants and lawyers. He stated that they have all been "learning as they go along" in this litigation about the differences between capital contributions and loans.

49.     He also stated that while the Potts debt was a major factor in deciding that he needed to no longer be an owner of Hanckel Marine, the Potts debt was one of many debts that were causing Milo and Hanckel Marine financial hardship.

50.     Milo's other relevant testimony largely mirrored Miles' testimony.

51.     Pam testified. She stated that as bookkeeper, she kept track of the day to day financial transactions using Quickbooks. She did not perform any of the accounting, and instead

relied on outside professionals to prepare the tax returns and perform any reconciliations or adjustments to the year-end books.

52.     Pam testified that they (Miles, the accountants, the lawyers, and herself) decided that Milo should no longer be an owner of Hanckel Marine because his credit had deteriorated to a point where Hanckel Marine was having problems securing floor plan financing.

53.     She further testified that this continuing litigation has caused one boat manufacturer to withdraw its line from Hanckel Marine, one floor plan financer to terminate its financing, and other floor plan financers to threaten to terminate financing.

54.     Pam testified that she put her personal savings into Hanckel Marine in "bits and pieces" when money was tight. She reported money she lent to Hanckel Marine in the Quickbooks ledger as a loan. She also testified to the general poor financial condition of Hanckel Marine from 2008 to the present.

55.     Pam testified that she did not focus on or completely understand the difference between paid-in capital and loans.

56.     The amounts of money Pam loaned to Hanckel Marine were eventually memorialized in promissory notes on the advice of the accountants. Pam testified regarding exhibits 27 and 28, two promissory notes from Hanckel Marine and Milo payable to her and Miles. Neither promissory note is dated.

57.     Exhibit 27 is a promissory note in the amount of $339,800. Installment payments of $1,415 per month were to begin on December 1, 2009. Exhibit 28 is a promissory note for $311,744, with monthly payments of $1,250 to begin January 1, 2010.  Both notes were due in full December 1, 2014.

58.     Pam stated that the dollar amounts of the promissory notes represent the accumulated amounts she loaned Hanckel Marine. She thought putting the amounts together in notes was more formal than a family business required, but acted on the advice of the accountants. At the time the accountants created the notes she did not think bankruptcy was in Milo's future.

59.     Pam also testified regarding Hanckel Properties' relationship with Hanckel Marine. She stated that Hanckel Marine pays Hanckel Properties $9,300 per month, which is equal to the monthly mortgage obligation Hanckel Properties has for the property it rents to Hanckel Marine. Previously Hanckel Marine paid Hanckel Properties $1,000 more, but when the business began to struggle the rent was lowered.[34]

60.     She speculated, without objection, that based on her experience with her family's business the fair market rental of the property should be higher. Hanckel Marine pays the lower rent because it is the family business.

61.     Pat Welch ("Welch"), Hanckel Marine's accountant, confirmed Pam's testimony regarding the loans and the financial situation of Hanckel Marine.

62.     He stated that it was not unusual for small business owners to put additional funds into their businesses, and he would advise the owners to decide whether those monies should be considered loans or paid-in capital.

63.     He also testified that, according to the tax returns,[35] both Milo and Miles were receiving salaries of roughly $90,000 in 2008. Their salaries had decreased in 2009 to $72,118 for Miles and $59,200 for Milo. In 2010, their salaries had decreased to $36,931 and $20,800, respectively. In 2011, after Milo transferred his interest, his compensation rose to $60,207; Miles'

---

[34] Although Hanckel Properties is owned by both Miles and Pam, it was clear from the testimony that Pam directed the business.

[35] The tax returns were admitted into evidence as Exs. 4 – 9.

salary was $22,249. The 2011 tax return showed Milo receiving a salary of $84,850, and Miles'
salary decreasing further to $20,800.

64.    Welch testified that the company never had sufficient profit to make distributions
to its owners. He believed that the "distributions" listed in the tax returns were generally payments
made to Pam on account of earlier loans rather than reflecting actual distributions to members of
the LLC.

65.    He testified that the returns in 2010 and 2011 reported interest accrual on Pam's
loans that were evidenced by the promissory notes. By 2013, however, no interest accrual on the
loans was reported in the tax returns. Welch testified that this change was a result of the likelihood
that the loans would not be repaid.

66.    Welch also testified that Hanckel Marine's gross receipts, total income, and
ordinary income as reported on the tax returns, was as follows:

| Year | Gross Receipts | Total Income | Ordinary Income |
|------|----------------|--------------|-----------------|
| 2008 | $7,059,450 | $1,991,661 | -$623,237 |
| 2009 | $5,708,697 | $1,570,131 | -$1,448,762 |
| 2010 | $3,379,266 | $1,181,280 | -$115,824 |
| 2011 | $4,445,329 | $1,305,822 | -$48,218 |
| 2012 | $4,692,710 | $1,376,714 | -$62,287 |

67.    Both sides presented experts, and both sides objected to admission of the opposing
expert's testimony.

68.    The Hanckels presented expert testimony from W. Ellison Thomas ("Thomas").

69.     Thomas is a certified public accountant, designated as a certified valuation analyst, and certified in financial forensics.

70.     He has been assisting clients in determining whether to buy businesses for nearly twenty years. He said that based on his research, there is no template for valuing a boat dealership.

71.     To prepare his report, he reviewed a report prepared by the opposing expert, spoke with the Hanckels' lawyers, reviewed the operating agreement, reviewed the financial statements, and spoke with the accountants.[36]

72.     He valued the interest on the date of the filing of the bankruptcy petition based on how he read and understood the operating agreement.

73.     He explained that he generally performs two kinds of valuations: a calculation valuation and a conclusion valuation. In a calculation valuation, the client and accountant discuss the purpose of the valuation and decide what kind of valuation methodology is appropriate. A conclusion of value is a more comprehensive valuation and considers multiple approaches to valuation.

74.     He decided that a calculation of value approach was more appropriate given the financial condition of the company.

75.     He stated that he thought that a calculation of book value, otherwise referred to as the "asset approach," was appropriate. He explained that this approach totals the assets and liabilities held by a company, then subtracts liabilities from assets to determine a value.

76.     In support of his determination that the asset approach was the better approach, Thomas critiqued the approach of the opposing expert. Thomas opined that Hanckel Marine is too financially distressed to be able to make payments to equity holders in the future. The valuation

---

[36] Thomas's report is Ex. 34.

approach used by the trustee's expert was described as a discounted cash flow analysis, which envisions payments to equity holders. Because those payments, in Thomas' opinion, were not realistic in the foreseeable future, he opined that valuation using that methodology was "nonsensical".

77.     Based on the information provided to him and his calculations, Thomas valued the full interest of Hanckel Marine, not including repayment of Pam's loans in full, at -$195,000. Including repayment of Pam's loans, the value was -$580,000. In short, Thomas believes the interest held by the estate is worthless.

78.     His opinion is that a hypothetical buyer would not consider buying a 50% interest of Hanckel Marine. He thought it was far too risky because of the informal way the business was run, particularly in that no employees had contracts or non-compete agreements; there was no formal lease; the salary being paid to Miles is extremely below market; and the only reason Pam had not asked to be repaid was because the of the family nature of the business. He thought it particularly significant that Milo could leave the business at any point and set up a competing business.

79.     The trustee presented expert testimony from Matthew Bernstein ("Bernstein").[37]

80.     Bernstein is a certified public accountant, accredited in business valuation, and has been performing valuations for nearly ten years.

81.     The trustee provided the Court with two reports written by Bernstein. In his first report, Bernstein valued the interest as of the date of the pre-petition transfer of the interest to

---

[37] Bernstein's reports are Def. Ex. G and H. He only testified with regards to H.

The trustee also presented testimony from Potts. The trustee had submitted an expert report by Potts, Ex. I. In their proposed pre-trial order, the Hanckels object to admitting the report and Potts as an expert. At the hearing, the Hanckels objected to Potts as an expert, stating he was disclosed late. After a brief discussion the trustee decided not to offer Potts as an expert. This resulted in Potts' testimony being extremely brief. It did not go to the issue of value. Accordingly, it is not discussed.

Miles.[38] His second report values the interest as of March 31, 2015.[39] Bernstein only testified regarding the more recent report.

82.    Bernstein consulted with the Trustee and reviewed the business records of Hanckel Marine to perform his valuation.

83.    Generally, Bernstein disagreed that the financial future of Hanckel Marine was poor, based on Hanckel Marine's increase in sales over the past few years.

84.    Bernstein used the discounted future benefits method to value Hanckel Marine. Bernstein stated he used this method because it is the most accurate way to value a business that is a going concern.

85.    This method takes future economic benefits, which Bernstein defines as cash flow to equity, and discounts those benefits "at a rate of return commensurate with the risk of achieving the benefit stream."[40]

86.    To determine cash flow, Bernstein assumed certain costs, such as operating costs, salaries, rent, and debt, will remain more or less constant, or vary at a predictable, constant rate. He also assumes a certain rate of profit growth over time.

87.    He did not include any significant increases in his valuation for salaries, rent, or debt.

88.    Bernstein's analysis then discounts the cash flow based on a risk rate. He used a composite risk rate that combined the standard 20-year Treasury yield, a common stock equity premium, and increased the risk rate based upon Hanckel Marine being a family-run, closely held, and not publicly traded business.

---

[38] Ex. G., page 17.

[39] Ex. H, page 20.

[40] Ex. H, page 14.

89.    Bernstein provided the Court with a table showing how changes in the gross profits and changes in perceived risk factors would affect his opinion as to value:[41]

**Discounted Cash Flow**

|  |  | 21% | 23% | 25% | 27% | 29% |
|---|---|---|---|---|---|---|
|  | 21% | $167,000 | $148,000 | $133,000 | $120,000 | $109,000 |
|  | 21.5% | $347,000 | $310,000 | $279,000 | $253,000 | $232,000 |
| **Rate of** | 22.0% | $500,000 | $447,000 | $403,000 | $367,000 | $336,000 |
| **Growth** | 22.5% | $650,000 | $582,000 | $525,000 | $479,000 | $439,000 |
|  | 23.0% | $801,000 | $717,000 | $648,000 | $590,000 | $542,000 |

90.    Bernstein ultimately concluded, presuming a rate of growth of 22% and discounted cash flow of 25%, that the business is worth $403,000, thus the interest held by the estate worth $201,500.

91.    He acknowledged, on cross examination, that his analysis did not consider certain specific risk factors concerning Hanckel Marine's situation. He did not know or consider, for example, that there was no formal lease, that the floorplan lenders were threatening to leave and in fact one already had, and that Hanckel Marine had recently lost a contract with one of its boat manufacturers. He agreed that these facts would lower the valuation and increase the risk.

92.    Finally, he stated that his analysis did not consider Pam's loans being repaid because even though they were listed as debt on the books, they were no longer accruing interest.

---

[41] Ex. H, page 19.

He therefore decided, because the loans did not "act" like debt in the books, they should not be treated as a debt that is due immediately for the purposes of valuation.

93.    At the close of trustee's direct examination of Bernstein, the Hanckels moved to exclude Bernstein's testimony, arguing he was not properly offered as an expert. The trustee responded that he believed the parties had an agreement that their experts were offered and accepted as to the content of their reports, thus permitting the parties to forgo formally offering the experts to the Court.

94.    The Hanckels disagreed this was the agreement, arguing that the agreement was only with regards to asking leading questions about the expert's qualifications.

95.    The Court overruled the objection, noting that even assuming the Hanckels' understanding of the agreement was correct, while there may have been a procedural deficiency in not offering Bernstein as an expert, Bernstein had been disclosed as an expert, submitted expert reports, and deposed as an expert with regards to the reports prior to trial. The Court admitted Bernstein as an expert regarding the contents of his report.

96.    At the close of the Hanckels' evidentiary presentation, the trustee orally moved for nonsuit on the grounds that the Court lacked the authority to value the interest, and that the trustee had never agreed to a trial on valuation. The Court denied the request, noting that it had ruled on summary judgment that valuing the interest was the issue left for trial.

97.    At the close of the trial, the trustee again asked the Court to consider dismissing the proceedings as meritless on account of the Court's alleged lack of authority to determine value. The Court asked the trustee to brief this issue in his post-trial submissions.

98.    Additionally, the Court granted, over the trustee's objection, the Hanckels' oral motion to amend the pleadings to conform them to the evidence. Fed. R. Civ. P. 15(b)(2).

99.     The parties submitted post-trial proposed orders. These orders largely conformed to the arguments and evidence presented at trial.

100.     On November 19, 2015 the trustee filed a motion, pursuant to Fed. R. Civ. P. 59[42], for a new trial or to reopen the record.

101.     The trustee's motion states that on November 13, 2015, Hanckel Marine filed a complaint in state court against the attorney that advised Milo to transfer his interest in Hanckel Marine. The trustee alleges that as a holder of an interest in Hanckel Marine, Hanckel Marine had a duty to inform the trustee of the lawsuit before filing it; that the lawsuit, an asset of Hanckel Marine, should have been disclosed as part of the valuation process; and that the allegations in the complaint bring to light further evidence of the Hanckels' pre-petition bad faith actions.

102.     Attached to the motion is the complaint filed in state court. In summary, the complaint alleges that the actions of Hanckel Marine's attorney, actions that were recommended as part of a course of action to protect Hanckel Marine, have resulted in the litigation currently before the Court which has financially ruined Hanckel Marine.[43] Much of the evidence in the complaint supporting the malpractice cause of action was collecting during the discovery period in the fraudulent transfer and recovery adversary proceeding.

103.     The Hanckels responded to the motion, arguing that Hanckel Marine had no obligation to inform the trustee of the lawsuit because the interest held by the estate, an interest the Hanckels characterize as a distributional interest, is not entitled to any managerial rights. The Hanckels also argue that the trustee should not be surprised by the filing of the lawsuit because it

---

[42] Made applicable in bankruptcy proceedings by Fed. R. Bankr. P. 9023.

[43] The complaint further states that the recovery of the LLC interest has resulted in a "de facto shot-gun wedding between Hanckel Marine and the United States Trustee ... ." This is incorrect. The party administering the LLC interest is the chapter 7 trustee, not the United States trustee. *Compare* 11 U.S.C. § 307 *and* 11 U.S.C. §§ 701, 704.

is the trustee's "legal tyranny" and "scorched earth litigation strategy" that precipitated the filing of the malpractice action.[44]

## II.    Conclusions of Law

At issue in this case is the value of a dissociated LLC interest recovered by the estate as fraudulently transferred. The trustee argues that the Court lacks authority to value the interest, asserting instead that value must be determine by the trustee's sale of the asset. Alternately, the trustee asks the Court to value the interest as of the time of the trial; find that the estate is entitled to any appreciation of the LLC interest between the filing of the petition and the present; and use Bernstein's discounted cash flow to determine value. Regardless of which path the Court takes, the trustee further requests Pam's loans be either subordinated or re-characterized as capital contributions.[45] The Hanckels argue that the proper date of valuation is the date of the filing of the bankruptcy petition; that the asset valuation approach of their expert is appropriate; and that Pam's contributions should be recognized as loans requiring repayment, not equity.

### A.  Authority to Value the Interest[46]

---

[44] The response also states that Milo's interest would have been dissociated merely by the filing of the bankruptcy petition. This is incorrect. As explained both in the Court's earlier order and in this order, § 541(c)(1) invalidates clauses, such as the one in the operating agreement, that change the nature of property held by the estate upon filing of a bankruptcy petition. That provision is not applicable here by virtue of the property becoming part of the estate after the filing of the petition through avoidance and recovery. Additionally, the complaint alleges that the trustee agreed that he held solely a distributional interest in his pre-trial order. Although the document at issue refers to a distributional interest, nowhere did the trustee agree that was what the estate held. Finally, the Court's earlier summary judgment order explicitly stated that the estate held more than just a distributional interest, according to section 3.24 of the operating agreement.

[45] The trustee did not raise the issue of enjoining Hanckel Properties from terminating its lease at any point after the motion to dismiss. Accordingly, that cause of action is deemed abandon.

[46] In addition to the argument addressed here, the trustee argues that the issue of valuation was not properly pled. This is incorrect. Plaintiff has always requested a valuation of the interest. In the original complaint, the prayer for relief asks the Court to find "that the fair value of the Debtor's membership interest in Hanckel Marine, LLC is zero." The trustee's response to that complaint denied that this value was correct but did not object to valuing it. The prayer for relief in the amended complaint is even clearer, asking the Court to determine "the value of the debtor's distributional interest … was zero" and "find and hold that the fair value of the Debtor's membership interest … is zero." Finally, at the hearing on the motion for summary judgment, the trustee agreed with the Court that the issue of

The Court's previous order held that the interest held by the estate is that of a dissociated member. Because the membership interest was recovered and is dissociated, both state law and the bankruptcy code provide for the Court to rule on value.

"The commencement of a case under … this title creates an estate." 11 U.S.C. § 541(a). Section 541 lists seven different categories of property that comprise the estate, including, most broadly, "[a]ll legal or equitable interests of the debtor in property … as of the commencement of the case." 11 U.S.C. § 541(a)(1). Importantly, Milo's interest in Hanckel Marine was not held by him at the commencement of the case, and thus is not § 541(a)(1) property. It was recovered by the trustee pursuant to § 550. Property recovered post-petition becomes property of the estate by virtue of § 541(a)(3) (including in the estate "[a]ny interest in property that the trustee recovers under section … 550 … .").[47]

---

value was to be determined at trial. For the trustee to now argue he "consistently objected to trying valuation" finds no support in the record.

Even if valuation was insufficiently pled, as noted, the Hanckels moved to conform their pleadings at the close of the trial. Fed. R. Civ. P. 15(b)(2) permits issued to be tried by implied consent and the pleadings so conformed. "A party can give implied consent to the litigation of an unpleaded claim … through … effective engagement of the claim." *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 319 (1st Cir. 2012). The trustee has been actively participating in this litigation; indeed, he has come before the Court numerous times asking for discovery orders regarding Hanckel Marine's financial documents so that he may determine the value of the interest. He engaged an expert to determine its value and presented that expert to the Court. The trustee consented to trying value.

[47] Although one court has held to the contrary, *Am. Nat. Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266 (5th Cir. 1983), the majority view is that property coming into the estate as recovered property is a separate category of property than property held by the debtor at the commencement of the case. *FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 130 - 131 (2d Cir. 1992) (holding that property subject to a fraudulent conveyance action was not subject to the automatic stay until it was recovered); *Rajala v. Gardner*, 709 F.3d 1031, 1038 - 39 (10th Cir. 2013) (holding that a party could not be punished for violating the automatic stay with respect to property that was later recovered because at the time of the action the property was not part of the estate). This is because "[i]f property that has been fraudulently transferred is included in the § 541(a)(1) definition of property of the estate, then § 541(a)(3) is rendered meaningless with respect to property recovered pursuant to fraudulent transfer actions." *In re Saunders*, 101 B.R. 303, 305 (N.D. Fla. 1989). To hold otherwise would have serious implications for any pre-petition transfers, effectively "plac[ing] a cloud on title … until there is a judicial determination that the transfer is not avoidable." *Id.* The Court agrees with the reasoning of the majority.

Although federal law defines property of the estate, state law determines the nature and extent of the property interest. *Butner v. U.S.*, 440 U.S. 48, 54 – 55 (1979). The property interest held by the estate is an LLC interest governed by the operating agreement and the Uniform Limited Liability Company Act, S.C. Code Ann. § 33-44-101 *et seq*. ("the Act"). Under both the operating agreement and state law, the filing of the bankruptcy petition dissociated the interest. Ex. 1, ¶ 3.24; S.C. Code Ann. § 33-44-601(7)(i). The trustee argued that this dissociation was ineffective pursuant to bankruptcy law, specifically § 541(c)(1)(A). This section provides

> [A]n interest of the debtor in property *becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5)* of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law –
>
>> (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1)(B). Although this section would invalidate the state law provision rendering the membership dissociated based on the filing of the bankruptcy petition, the section is inapplicable to Milo's interest because it is not § 541(a)(1), (2) or (5) property; it is (a)(3) property. *Accord Waldron v. Huber (In re Huber)*, Case No. 11-41013, Adv. Pro. No. 12-04171, 2013 WL 6184972 at*3-4 (Bankr. W.D. Was. 2013); *Texas Attorney General v. Brown (In re Fort Worth Osteopathic Hosp.)*, 387 B.R. 706, 713 (Bankr. N.D. Tex. 2008). The Court previously held, at summary judgment, that the interest at issue is that of a dissociated member. The Court takes this opportunity to further explore the reasoning here.

Section 541(c)'s inclusion of only (a)(1), (a)(2) and (a)(5) property at first glance seems curious. It is not self-evident from the statute why only these categories of property are subject to § 541(c)'s extinguishment of *ipso facto* clauses, and there is little or no legislative history, treatise

commentary, or case law as to the reason. However, the inclusion of only these three categories of property has a basis: they are the three categories of property that are held by the debtor at the commencement of the case. The other subsections of § 541(a) identify property that becomes part of the estate post-petition, primarily property recovered or acquired by the estate; and are subject to additional code provisions. 11 U.S.C. § 541(a)(3), (4) (including property or value recovered after avoidance under several code sections); (a)(6) (including "proceeds, product, offspring, rents, or profits of or from property of the estate"); and (a)(7) (including "interest[s] in property that the estate acquires after the commencement of the case."). The drafters of the 1978 Code were harmonizing provisions intended to work in unity. Revisions and amendments across nearly four decades sometimes lead us to overlook the integration of the provisions of the original code.

When a trial court orders recovery pursuant to § 550, it has the option of either awarding the value of the property transferred or returning the property. 11 U.S.C. § 550(a) ("the trustee may recover … the property transferred, or, if the court so orders, the value of such property"). This Court did not award a sum certain, despite such a request from the trustee in the first adversary proceeding, because there was no evidence of value before the Court at the time. The fact that this Court could have determined a value supports the decision to now value the interest and award that sum to the trustee in return for extinguishing the recovered interest. The parties have presented evidence of value that was missing in the first adversary proceeding, and it is natural to value an interest recovered in order to advance the administration of the estate. Courts across the country differ on when valuations of property recovered pursuant to § 550 should occur, and the Fourth Circuit has not supplied a final answer. However, it is important for trial courts to have broad discretion in valuing property or ordering recovery since the avoidance of transfers can range from

conveyances to the innocent to conspiracies intended to defraud creditors and thus, the timing of the valuation can be important.

State law also provides for the valuing of the interest at issue. The operating agreement provides that the dissociated member "shall be entitled" and "shall additionally receive" certain monies in return for the interest in accordance with the Act. Ex. 1, ¶ 3.24. The Act states that the effect of dissociation is that "the company must cause the dissociated member's distributional interest to be purchased." S.C. Code Ann. § 33-44-603. It also states that if the parties cannot come to an agreement on the purchase price of the interest, "the dissociated member … may commence a proceeding against the limited liability company to enforce the purchase." *Id*. 701(d). If the member brings the proceeding, the court must determine the fair value of the interest in accordance with the statute and "order the limited liability company to purchase or cause the purchase of the interest." *Id*. 701(e). The trustee argues that these provisions result in the dissociated member alone having the power to request valuation of the interest.

The Court disagrees, and thinks the trustee places too much emphasis on passive language rather than reading the statute as a whole. The LLC has an obligation to purchase the dissociated interest. The comments to the LLC Act envision a dissociated member having the right to expeditiously receive, and the LLC to pay, the value the membership. Comments to S.C. Code Ann. § 33-44-603 ("[d]issociation … causes the dissociated member's distributional interest to be immediately purchased under Article 7"). In order for the dissociated member to receive its value, the LLC "must cause" the purchase. S.C. Code Ann. § 33-44-603. If the company does not cause the purchase, the dissociated member *may* bring a proceeding, and, upon determination of value, the LLC must either "purchase or cause the purchase" of the interest. S.C. Code Ann. § 33-44-701(d), (e) (emphasis added). True, the LLC statute states the member may bring the proceeding.

But it does not state that the member is the sole party that is allowed to initiate the proceeding. Instead, it *requires* the LLC to *cause* the purchase. Instituting a proceeding to determine the value that must be paid to purchase the interest is a necessary part of causing the purchase when an agreement is not reached. Although it may be procedurally unusual for an LLC rather than a member to request valuation, and the passive language in the statute creates some confusion, the trustee has cited no authority, and this Court has found none, depriving Hanckel Marine of the ability to comply with its statutory obligation.[48]

The bankruptcy code contains a variety of provisions that enlarge a bankruptcy trustee's power to sell assets of the estate. *E.g.*, 11 U.S.C. § 363(f) (permitting a trustee to sell property free and clear of third party interests); (g) (permitting a sale free and clear of vested or contingency dower or curtesy rights); and (h) (permitting sales despite certain forms of co-ownership). None are applicable here. Absent bankruptcy code authority, the trustee cannot exercise rights to property that a debtor would not have. *In re Todd's*, 118 B.R. 432, 435 (Bankr. D.S.C. 1989) (enforcing a right of first refusal in a partnership agreement). The Debtor would own a dissociated interest that Hanckel Marine must "cause" to be purchased. Valuing that interest is part of causing the purchase. The Hanckels are entitled to a determination of value of the LLC interest.

---

[48] The Court would also note that the trustee has a duty, pursuant to § 704, to "collect and reduce to money the property of the estate … and close such estate as expeditiously as is compatible with the best interest of parties in interest." *See e.g., Yadkin Valley Bank & Trust Co. v. McGee (In re Hutchinson)*, 5 F.3d 750, 754 (4th Cir. 1993) (holding that the trustee did not violate its duty to liquidate expeditiously despite various delays in finalizing the sale of the assets of the estate); *In re Riverside-Linden Inv. Co.*, 925 F.2d 320 (9th Cir. 1991) (denying attorney fees sought by the attorneys of the trustee when the trustee's investigations were clearly unwarranted, and the continued investigations only served to increase professionals' fees). Permitting the trustee here to hold the LLC membership indefinitely is in tension with these principles.

The Court would additionally note that if the trustee were to attempt to sell the interest, that sale would still be subject to the various restrictions on transfer that are not conditioned on the interest being in bankruptcy. 11 U.S.C. § 363(l). Administering partial LLC interests is a thorny issue. *See* Richard J. Mason, *et al, Can an Estate Effectively Liquidate a Fractional Interest ibn an LLC?* 34 Am. Bankr. Inst. J. 32 (October 2015).

*a. Expert Objections*

The parties objected to each other's experts. The Hanckels argue that Bernstein's testimony is not relevant or reliable because he did not utilize the most recent financial information available and he did not interview the Hanckels. The trustee argues Thomas' testimony is not relevant or reliable because he utilizes an improper valuation method and the wrong date for valuation. Both objections are overruled.

The federal rules of evidence apply in bankruptcy court. Fed. R. Evid. 101 (citing Fed. R. Evid. 1101). Whether a witness is qualified as an expert is a matter to be decided by the judge. Fed. R. Evid. 104(a). Fed. R. Evid. 702 states the rule for qualifying experts and admitting their testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if:
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

When determining the admissibility of expert reports and testimony, the trial judge acts as a gatekeeper with wide discretion. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). A judge's role is merely to engage in "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–93 (1993). The court's discretion is particularly broad

in bench trials, for there is no jury to protect from unreliable information. *See Palmacci v. Umpierrez*, 121 F.3d 781, 791 (1st Cir. 1997).

Expert testimony is admissible "if it is both relevant and reliable." *In re Opelika Mfg. Corp.*, 66 B.R. 444, 597 (Bankr. E.D.N. Ill. 1986). This standard is not a rigorous one: "The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research. Rather the test is whether the 'particular opinion is based on valid reasoning and reliable methodology.'" *In re TMI Litigation*, 193 F.3d 613, 665 (3d Cir.1999), amended on other grounds, 199 F.3d 158 (2000), (quotes omitted). When the assumptions underlying an expert's opinions are unsupported and speculative, the expert's testimony may properly be excluded. *In re Worldcom, Inc.,* 371 B.R. 33, 41 (Bankr. S.D.N.Y. 2007).

Both Bernstein and Thomas's testimony and reports meet the required standard. They are both business valuation experts that provided the Court with useful information in determining value. Both relied on financial documents supporting their analysis; Bernstein's lack of access to the most current information and his failure to talk to the Hanckels personally is insufficient to render his analysis speculative. Both used widely accepted methods of valuation; provided reasonable explanations as to why they chose the method they did; and provided the Court with reasonable critiques of the other's methodology. Their testimony and reports are therefore admitted.

### b.  The Date of Dissociation and Valuation

The Court now turns to the value of the interest. The operating agreement provides that a dissociated member is entitled to value from two different sources: (1) "any distribution" he or she was entitled to prior to the dissociation; and (2) "the fair market value of the Member's

Membership in the Company as of the date" of the dissociating event. The evidence presented at

trial was that no distributions had been made to the members of Hanckel Marine for the past six

years.[49] The evidence also demonstrated the liquidity issues Hanckel Marine has faced over the

past years, supporting the conclusion that no distributions could have been made. The trustee did

not argue that there were outstanding distributions owed to the estate, or that distributions were

improperly withheld. Accordingly, the value of the distributions the LLC interest was entitled to

receive prior to dissociation is zero.

This brings the Court to determine the interest's fair market value as of the date of

dissociation. The dissociated interest was dissociated by virtue of being in bankruptcy. However,

at the time the bankruptcy was filed, that interest was not part of the estate. It did not become part

of the estate until it was recovered, either at the time the Court ordered the recovery, or the time

that order became final. Additionally, the interest was not defined as a dissociated interest until

the Court held it was a dissociated interest in its order on partial summary judgment. During this

entire time period, Hanckel Marine operated as a going concern. Indeed, the evidence presented to

the Court demonstrated at trial that the business has been improving. This is not the sort of

dissociation event that is considered by the LLC Act, and there is no South Carolina case law to

provide the Court with guidance.

Elsewhere, however, at least one court has faced a situation where there is a delay between

determining that an interest is dissociated and distribution to that interest, all the while with the

LLC still operating as a going concern. In *Pastimes, LLC v. Clavin*, 274 P.3d 714 (Mont. 2012),

an LLC member brought a cause of action for a declaratory judgment valuing the interest of a

---

[49] Under the operating agreement, any distributions that would have made the company unable to pay its debts as they became due are prohibited. Ex. 1, ¶3.23. The evidence presented demonstrated that Hanckel Marine has been unable to pay all of its debts as they came due for at least the past five years.

deceased member. The deceased member had died some five years before the litigation began. *Id*. at 716. When the member died, the remaining member could not come to an agreement as to the value of the interest, so he decided, with the consent of decedent's heirs, to continue the LLC and provide the deceased's estate with whatever distributions it was entitled to prior to death. *Id*., at 716. At issue in the litigation was what date the court should use to value the interest. *Id*.

The court ruled that the proper date of dissociation and valuation was at trial. *Id*. The court did so recognizing that the remaining LLC member had not acted with respect to the LLC as was envisioned by the operating agreement. *Id*. The operating agreement provided that the LLC would terminate upon the death of a member. *Id*. Instead of terminating the LLC, the remaining member continued operating the LLC and the parties continued to realize value from their investment. *Id*., at 717. The parties continued to operate the LLC up through the trial. *Id*., at 718. This effectively modified that agreement, and did so for the benefit of the LLC and its members. *Id*. The proper date of valuation was therefore at trial. *Id*., at 719.

Here, Hanckel Marine has been operating throughout the course of this and the previous litigation. Although it has suffered financial losses, the evidence demonstrated that the business has been improving, and that continued operation benefited the remaining member. It also benefited the Debtor who was able to take a salary from the business and improve his personal financial condition. Upon the filing of the bankruptcy, Hanckel Marine did not treat Milo's interest as dissociated; it was not known at that time that the interest was of a dissociated member. Since the Court ruled the membership was a dissociated interest, Hanckel Marine and the trustee have been engaged in litigation, all the while with Hanckel Marine still operating. Hanckel Marine has been operating as if the dissociating event had not occurred. Accordingly, the proper date of dissociation and valuation is at trial.

Because valuing the membership interest as of the date of trial is proper, Bernstein's valuation approach is more persuasive. Thomas's approach, at the Hanckels' instruction, valued the interest with set assets and liabilities on a date over four years ago. He did not provide the Court with any evidence as to how those numbers could or would change over time. Bernstein's approach provides the Court with a value for Hanckel Marine nearer to the date of trial. His approach valued the business as a going concern rather than as one that was being liquidated. The business is operating and continues to improve. Valuing the interest at a point in the past is inconsistent with the ongoing actions of the members of Hanckel Marine.

Thomas's testimony, however, does lead the Court to make some adjustments to Bernstein's valuation. Bernstein stated he did not take into account issues with the floor plan financers, the lack of a lease, the loans made to Pam[50], or the issue that none of the employees have signed non-compete agreements. He testified that these factors would both potentially decrease Hanckel Marine's anticipated profits and increase the risk factors. Accordingly the Court finds that the appropriate discount rate should be 30%, one percentage point over the highest Bernstein used, and the appropriate gross profit should be adjusted to 21.5%, slightly lower than Bernstein's prediction. In accordance with the risk-profit table presented by Bernstein, the value of Hanckel Marine is therefore rounded to $210,000. The value of half that interest is $105,000.

---

[50] The trustee asked the Court to either re-characterize or subordinate Pam's loans. The Court declines to do either. There is no need for the Court to rule on that issue outside the valuation context. The risk factors considered by the Court take into account the possibility that the debts are loans and would be paid back, as well as other factors identified by the Court as increasing the discount rate. As Pam has not filed a claim against the bankruptcy estate, there is no need for the Court to make a determination with regards to her loans. *See In re Dornier Aviation (North American), Inc.*, 453 F.3d 225, 231 (4th Cir. 1992) ("A bankruptcy court may alter the priority of an *allowed claim* via equitable subordination") (emphasis added). The Court would additionally note that it is adopting the trustee's valuation approach, an approach that, unlike the Hanckels' book value approach, does not require determining treatment of the debts owed to Pam.

*c.   Motion for New Trial*

Although the oral arguments on the motion for new trial or to reopen the record have not yet been heard by the Court, the Court believes it has sufficient evidence before it to rule on the issue of value, and to later revise this order if necessary. The trustee asks the court to reopen the record to determine the value of the malpractice action filed against Hanckel Marine's attorney. While it is true that the action had not yet been filed at the time of trial, at trial the trustee did know that the avoided transfer occurred based on the advice of counsel; that the membership transfer had been avoided; and that Hanckel Marine claimed damages as a result. All of the information in Hanckel Marine's complaint was available to the trustee prior to the valuation hearing: most if not all of the evidence in the malpractice complaint comes from the fraudulent conveyance and recovery adversary proceeding.

Additionally, the trustee's valuation method, which the Court largely adopts in this order, was not based on simply totaling the value of assets and subtracting liabilities. It hinges on risk factors and profit projections. These factors and projections are not over-ridden by the existence of a particular asset, thus reopening trial to consider the value of a particular asset may be unnecessary. The trustee had this information prior to the valuation hearing and his expert did not explicitly consider litigation or recovery from a lawsuit in his risk and profit analysis. Reopening the case now to permit him to reconsider that assessment with information he had prior to the trial should not delay entry of this order. At the hearing on the motion for new trial, to the extent the trustee shows a previously unforeseeable change in the risk analysis, based on the filing of the malpractice action or is otherwise entitled to Rule 59 consideration, relief may then be available.

### III.    Conclusion

The Court has the authority to value the LLC interest held by the trustee. The value of that interest is $105,000. Payment of this sum by the Hanckels or Hanckel Marine will extinguish the interest the estate previously recovered. The Court will enter a judgment consistent with this opinion.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**12/11/2015**



David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

Entered: 12/11/2015